02-09-402-CV









 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

NO.  02-09-00402-CV

 

 


 
 
 In the Interest of B.G.D., A.J.D, and J.B.D., Minor
 Children
 
 
  
 
 
  
 
 
 
 
  
 
 
 
 
  
 
 
  
 
 
  
 
 


----------

 

FROM THE 89th
District Court OF Wichita COUNTY

----------

 

OPINION

----------

 

I. 
Introduction

          Appellant
Ricky Derzapf (Ricky) appeals the order granting Connie Johnson’s (Connie) petition
for grandparent visitation with Ricky’s children.  In seven issues, Ricky
contends that the trial court abused its discretion by awarding visitation to
Connie because Connie does not have standing, the trial court’s judgment
violates the law of the case, insufficient evidence supports the judgment, and
the court-appointed expert’s testimony should have been excluded.  Ricky also
seeks remand for reconsideration of his attorney’s fees. We reverse the trial
court’s judgment and remand the case for consideration of Ricky’s attorney’s
fees.

II. 
Background

A. 
General Background and Connie’s Original Suit for Custody

Ricky
and Jennifer Derzapf were married in the mid-1990s and had two children: A.J.D.,
born in 1996; and J.B.D., born in 2000.  B.G.D., born to Jennifer in 1991, is
not Ricky’s biological son, but Ricky adopted B.G.D. after he married Jennifer.[1] 
Jennifer was diagnosed with leukemia while pregnant with J.B.D. and passed away
on June 3, 2001.

Connie
is Jennifer’s mother and B.G.D., A.J.D., and J.B.D.’s grandmother.  For several
months immediately following Jennifer’s death, Connie and her husband, Randy
Johnson, served as the children’s primary caregivers.  Ricky and the Johnsons initially
worked cooperatively on the children’s behalf, but tension between Ricky and
the Johnsons increased once Ricky began reasserting himself as the children’s
primary caregiver.  The Johnsons perceived Ricky as emotionally distant, and
Ricky believed Connie was directly undermining his influence and authority over
the children and assuming the role of mother instead of grandmother.

On
May 6, 2003, Connie and Randy filed an original suit affecting the parent-child
relationship (SAPCR) seeking custody of the children and requesting that they
be appointed sole managing conservators, and they obtained an ex parte
temporary restraining order preventing Ricky from having possession of the
children.  Attached to the Johnsons’ original petition were affidavits by
Connie, Randy, and Connie’s three sons.  The Johnsons alleged in their petition
and affidavits that Ricky endangered the children (particularly B.G.D.) and
significantly impaired the children’s physical health and emotional development.
The affidavits also contained many critical assessments of Ricky’s fitness as a
parent and husband and included allegations of physical and verbal abuse.  For
example, Connie stated in her affidavit that Jennifer’s stress from living with
Ricky caused her immune system to “crash,” ending her sixteen-month battle with
leukemia.  After a hearing, the trial court dissolved the temporary restraining
order, returned the children to Ricky’s conservatorship, and dismissed the case
without prejudice.  Ricky then cut the children off from any contact with the
Johnsons.  

B. 
2005 Temporary Grandparent Visitation Order

Connie
and Randy filed this lawsuit, a petition for grandparent access, on March 10,
2004.  See Tex. Fam. Code Ann. § 153.433 (West Supp. 2010).  In October
2005, the trial court conducted an evidentiary hearing on the Johnsons’ request
for a temporary order for grandparent visitation.  Dr. Mark R. Otis, the
court-appointed psychologist, testified at the temporary orders hearing that Ricky’s
decision to cut off the Johnsons’ access to the children was justified under
the circumstances and that Ricky was understandably devastated, hurt, angry,
and offended by the Johnsons’ allegations.  Indeed, Dr. Otis wrote in his 2005
report that “Connie contributed significantly more to the atmosphere of
mistrust and hurt than Ricky or Randy.”  

Dr.
Otis also observed in his 2005 report that, in the months following the
original lawsuit and while the Johnsons did not have access to the children,
Ricky had taken the children to a counselor; that B.G.D. and A.J.D. were
prescribed anti-depressant medication; that the children’s pediatrician
concurred with Ricky’s conclusion that further contact with the Johnsons would
be harmful to the children’s emotional well-being; that the children showed
“significant improvement” in their “adjustment and personal well-being”; that B.G.D.
and A.J.D. were taken off the anti-depressants; that the children were released
from counseling; and that “collateral sources” had confirmed the children’s
improvement. 

Despite
the statements in his report, Dr. Otis also testified at the temporary orders
hearing that the children were “clearly distraught” about losing their
relationship with the Johnsons; that it makes A.J.D. sad to think about the
Johnsons; that A.J.D. “potentially might have some difficulties down the line”;
that A.J.D. and B.G.D. talk about the Johnsons “with a lingering kind of
sadness, a yearning”; and that cutting the children off from the Johnsons
“would not be healthy,” would be harmful to their long-term psychological
development, and could cause them to be “emotionally damaged.”  But Dr. Otis
also testified that the children’s sadness had “not manifested as depression or
behavioral problems or acting out” and that “sadness and yearning doesn’t rise
to a level of significant emotional impairment.”  Dr. Otis recommended that the
children’s visitation with the Johnsons begin in stages, first with Randy, then
with the children’s uncles, and later with Connie after she and her family
attended counseling.  After the hearing, the trial court signed an order
granting the Johnsons visitation on the first Saturday of each month.  

The
children had visitations with the Johnsons for the next sixteen months. Ricky
acknowledged that the visits went well.  His only complaints were that the
Johnsons’ gifts were a “little excessive” and that the Johnsons had allowed B.G.D.
to take his girlfriend to the lake with them, but he admitted that the Johnsons
were not aware that B.G.D. had been grounded at the time from seeing his
girlfriend. 

C. 
Ricky’s Petition for Writ of Mandamus

Ricky
sought mandamus relief after the trial court entered the temporary order
granting grandparent visitation with the children.  Although this court denied
Ricky’s petition, the supreme court granted it.  See In re Derzapf, 219
S.W.3d 327, 331 (Tex. 2007) (orig. proceeding).  The supreme court held that
Randy did not have standing as a step-grandparent to seek grandparent access
and that Connie had not met her statutory burden of proving that the children’s
physical health or emotional well-being would be significantly impaired in the
absence of visitation with her.  Id. at 332–33, 333–34.  After the
supreme court’s decision in March 2007, Ricky again denied the Johnsons any
access to or visitation with the children outside of five meals and the
children’s extracurricular activities, which the Johnsons only learned of by
communicating with B.G.D. 

D. 
Trial on the Merits

The
case proceeded in the trial court after the supreme court’s decision.  For his
part, Dr. Otis conducted a separate telephone interview with Ricky and Connie
and two interviews with the children.  He also conducted what he termed
“collateral interviews” with Randy, Dr. Connell, Barbara Lyne (mother of one of
B.G.D.’s friends), Sherry Cantu (friend of the Johnson family), and Sherri
Booker (friend of Ricky and the children).  Dr. Otis then issued an updated
report dated September 8, 2008.  Final trial on the merits before the court
began on April 6, 2009, and the trial court heard testimony from seven fact witnesses
and two expert witnesses.[2] 

Ricky
testified that his attitude toward Connie had not changed since 2005, that he was
not bitter toward Connie, and that he was concerned that her past alienating
behavior would continue in the future.  He also testified that Connie’s
affidavit in support of the 2003 SAPCR suit (filed by Connie and Randy for sole
custody of the children) was very destructive and caused a lot of his concern
and mistrust. 

Ricky
also testified about the children’s demeanor and improvement in 2003 and 2004
when they did not have contact with the Johnsons.  The children spent almost a
month in Houston with Ricky’s sister-in-law and later started counseling, and B.G.D.
and A.J.D. were initially prescribed anti-depressants. Ricky testified that he
did not notice any problems with the children between 2003 when they stopped
seeing the Johnsons and 2005 when the court-ordered visitations began and that
the children were “very good, very well stabilized.”  He said that the children
had very positive demeanors and that he did not observe the kids mourning or
grieving. 

Ricky
testified that he and the children moved from Wichita Falls to Burkburnett in
early 2007 because he could no longer afford the children’s private school and
because he had good friends in Burkburnett who could help him with the
children.  He said A.J.D. and J.B.D. play sports all year, that J.B.D. had been
involved in dancing and singing activities, and that he had not observed any
behavior in either child that caused him concern about their emotional states. 
Ricky testified that he had discussed the children’s mother with them almost
weekly; that he had talked with them regularly about what they were doing with
school, sports, and their friends; and that he had shown them physical
affection.  He testified that J.B.D. was doing well in school and generally
makes friends in any social situation.  He also testified that A.J.D. is
typically slower to make friends but that A.J.D. had surprisingly made friends
in Burkburnett almost immediately, and Ricky denied seeing the sadness,
longing, and frustration in A.J.D. that Dr. Otis had reported.

Ricky
admitted that his relationship with B.G.D. was somewhat different than his
relationship with A.J.D. and J.B.D., but he denied treating B.G.D.
differently.  He agreed that his relationship with B.G.D. had become
progressively worse, but he said that it began deteriorating before the
court-ordered visitations stopped in March 2007.  B.G.D. had started talking
about leaving home and had exhibited more defiant behavior about breaking
Ricky’s rules, and Ricky testified that B.G.D. had said he would move to
Connie’s and that he and Connie had been planning the move for a long time. 

Ricky
agreed that Connie is an important person in A.J.D. and J.B.D.’s life and that
the Johnsons provided them emotional nurturing, but he denied that Connie is a
core relation for either of them.  He testified that he believes he is
emotionally connected with his children, that he does not believe they mourn
the loss of contact with the Johnsons or yearn for more contact, and that he
feels it is in A.J.D. and J.B.D.’s best interest for him to be present at any
visitations with the Johnsons.  Ricky also testified that Dr. Otis’s graduated
visitation recommendation was not in the children’s best interest.

Ricky
also denied that he had cut off all visitations with the Johnsons and testified
that the children had been with them at five dinners and at as many as forty
extracurricular activities over a two-year period.  Ricky said that he was not
comfortable with gifts the Johnsons had given the children but that he tried
not to show any negativity.  He denied that he intended to discontinue all
contact between the children and the Johnsons if not court-ordered.  

Connie
testified that Jennifer and B.G.D. lived with her before Jennifer and Ricky
were married and that B.G.D. saw her every day during that time.  She testified
that she is emotionally bonded with all of the children.  She said that she
provided the children with emotional support when they lived with her following
Jennifer’s death and that Ricky had initially supported her role with the
children. Connie also testified about the conflict that arose when Ricky
decided that the children should live with him full time beginning in January
2003 and said that Ricky stonewalled her efforts to see the kids after that
time and that Ricky had not voluntarily allowed her any access to the children
between May 2003 and March 2004. 

Connie
testified that she had worked very hard since 2005 to avoid even the appearance
of impropriety.  She said she wanted Ricky “to understand that those kids love
both of us” and that she “want[ed] to let those kids love both of us because
that’s what’s in their best interest.”  Connie described the court-ordered
visitations and testified that they went very well, that she reconnected with
the children, that it was nurturing for the children to have the visitations,
and that the children see her as someone with whom it is safe to talk about their
mother.  She testified that she was very concerned that Ricky did not recognize
the emotions that the children reported to Dr. Otis, that Ricky did not
encourage the children to be their own person or to express their feelings, and
that she believed she could provide the children with emotional support.  However,
Connie agreed that A.J.D. and J.B.D. were “bonded and feel comfortable” with
Ricky.  Even so, she testified that she believed the children’s emotional
well-being would be significantly impaired if visitations with her were not
resumed. 

On
cross-examination, Connie agreed that her 2003 affidavit was hurtful and
damaging, but she testified that she stood by the statements in the affidavit and
that “facts don’t change.”  She also admitted telling B.G.D. in a 2003 letter that
he could divorce his father.  And although she admitted that Ricky adequately
fed, clothed, and sheltered the children, she testified that Ricky was not a
fit parent because he did not emotionally nurture the children.  Finally,
although Connie testified that she wanted court-ordered visitation with the
children, she also testified that she just wanted to be a grandparent and enjoy
her grandchildren “like [her] friends get to enjoy theirs.” 

Dr.
Mary Connell is a forensic and clinical psychologist who has studied alienating
behaviors and had worked with Connie since late 2004.  She described parental
alienation as someone trying to turn a child against a parent, and she testified
that she had worked with Connie to give her insight into her tendency toward
alienation and to help her learn to interact with Ricky and the children in a
positive and respectful manner.  

Dr.
Connell described Connie as “quite humbled” in 2004 and testified that Connie
understood the egregious and destructive nature of her past behavior.  Dr.
Connell testified that Connie had “absolutely succeeded in eradicating the
alienating language from her behavior and the impulses to alienate.”  She said
that Connie’s first reflex was now “generally neutral to positive on Ricky.”  Based
primarily on information relayed to her by Connie, Dr. Connell testified that
Connie nurtured the children’s emotional needs during the court-ordered
visitations and that Connie provided J.B.D. specifically with a same-sex role
model and a person who could provide information about her mother.  Although
Dr. Connell testified that Connie had “been an exemplar for positive work in .
. . eradicating those [alienating] behaviors,” she also agreed that the
recidivism rate for persons exhibiting alienating behavior is quite strong[3]
and that most of Connie’s underlying perceptions of Ricky remain negative. 

B.G.D.
testified that his petition for emancipation was granted a week before trial. 
He said that emancipation was his idea and that he had heard about the concept
years earlier from a girl at his school.  He described living with Ricky as
“pretty bad” and said that he was depressed, wanted to be left alone, and did
not want to associate with anyone.  B.G.D. testified that his relationship with
Ricky had always been “emotionally distant,” that he felt Ricky had treated him
as a child Ricky was forced to take care of, that Ricky’s relationship with A.J.D.
was different, and that Ricky had never put his arms around him and said that
he loved him.  B.G.D. admitted on cross-examination, however, that Ricky had
put his arms around him and said that he loved him and that Ricky taught him to
shoot a gun; worked with him to install speakers in his car; took him hunting;
and was there when he shot his first deer and first and second turkeys.[4]
 B.G.D. denied being manipulated or influenced by Connie to move into her home,
but he admitted that Connie bought him a one-year-old Mustang convertible within
two weeks of moving into her house and that, unlike Ricky, Connie allowed him
to have earrings and wear his hair long.[5] 

B.G.D.
also testified that he had “disowned” Ricky, that he no longer considered Ricky
his father, and that he planned to change his name to McAffey (his mother’s
maiden name).  B.G.D. also admitted telling Dr. Otis that “the rebel would come
and go” in him and that he believed Ricky’s rules, such as curfew and not being
home with his girlfriend when Ricky was not present, were unreasonable.  Finally,
B.G.D. admitted swinging at and choking Ricky in January 2008 after Ricky had grounded
him from seeing a new girlfriend.  

Randy
testified that when B.G.D. moved into their home, he and Connie also had
problems with B.G.D. following their rules.  Randy said that he and Connie
discussed the matter with B.G.D. and that after several months, B.G.D. began
following their rules and being respectful.  Randy denied that he and Connie
had bribed B.G.D. into coming to live with them and said that he had required B.G.D.
to work to earn additional spending money.  

Randy
reported positively about the court-ordered visitations and described how J.B.D.
sometimes cried and asked to spend the night when the visitations were over. 
He also testified that the children, when they had seen the Johnsons at
extracurricular activities or the scheduled meal visits, were hesitant to show
a great deal of affection when Ricky was present but that they had acted
differently when Ricky was not present.  Randy also testified that he had
promised the children’s mother that the children would be close to the Johnsons
throughout their lives, that he believed it was “terrible” that B.G.D. wanted
to disown Ricky and change his name, but that he believed Ricky was making decisions
that made him an unfit parent. 

Greg
Johnson, the children’s uncle, testified that he attended each of the sixteen
court-ordered visitations, that the children had loving interactions with
Connie during the visits, that the children were very emotionally bonded with
Connie, and that the children would benefit from seeing Connie.  Greg also
described an incident before Jennifer’s death in which he believed Ricky played
too roughly with B.G.D. and then ridiculed B.G.D. for crying. 

Tammy
Derzapf is Ricky’s sister-in-law.  She described Ricky as “quiet, kind of
introverted, but very loving, a very caring person.  Just very genuine.”  She
also testified that she believed Ricky to be “very much” emotionally in tune
with the children’s feelings and that she had not seen the children exhibit
reluctance to share their feelings with him. 

Tammy
testified that the children had extended summertime visits with her in Houston
each year, beginning in 2003 shortly after the Johnsons’ original SAPCR
filing.  Tammy testified that B.G.D. said in 2003 that he did not want to
participate in their family prayer before dinner because he did not want to go
against Connie’s wishes.  In 2004, Tammy observed that the kids were happy and
that B.G.D. was not as mean to A.J.D. as he had been in 2003.  Tammy testified
that the children’s demeanor was also good in 2005 and that they did not seem
to be sad, depressed, grieving, or mourning, but she said that “something had
changed” in 2006.  A.J.D. and J.B.D. were doing well in 2006, but she said that
B.G.D. was not happy, was very mean to A.J.D., and was confused and distrustful. 
In 2008, only A.J.D. and J.B.D. visited, and Tammy observed that A.J.D. was
more relaxed than he had been in a long time and made friends with several neighborhood
kids.  

Steve
Booker is an attorney in Burkburnett, and he and his wife Sherry are Ricky’s
close friends.  Steve and Sherry had seen Ricky and the children two to three
times per week during at least the previous year.  Steve described A.J.D. as
quiet but “all boy,” and he testified that A.J.D. had “a bunch of friends” that
often visited him at Ricky’s house.  He described J.B.D. as a “pistol” and
“happy go lucky” and said she always wanted to be the center of attention. 
Steve testified that he had not seen the children exhibit any lingering
sadness, depression, or frustration and that he perceived Ricky as sensitive to
the children’s emotional needs. 

Dr.
Otis testified that Ricky was resentful of and did not trust Connie, that Connie
was no longer bitter at Ricky and was managing her past alienating behavior, and
that the children had observed her changed attitude.  Dr. Otis testified that
the children renewed their attachments to the Johnsons during the court-ordered
visitations, but he said that the current level of contact was not meeting
their emotional needs.  Dr. Otis testified that A.J.D. in particular “yearns”
for more contact with the Johnsons, that A.J.D. would feel “deep
disappointment” if not allowed to see the Johnsons regularly, that A.J.D.
“grieves” not seeing them, and that A.J.D.’s deep disappointment could
“potentially manifest itself into potential depression” and could “potentially
manifest itself in anger at Ricky.”  He testified that there was a “high
probability” that denying A.J.D. visitation with Connie would significantly
impair A.J.D.’s emotional well-being, but he also said that A.J.D. was “very
bonded” with Ricky, was not affected by Ricky’s negativity toward Connie, and
did not want anything to interfere with his living with Ricky. 

Dr.
Otis described J.B.D. as very social, extroverted, affectionate, and
forthcoming, and he testified that she “gets a great deal of social support
just about everywhere she turns.”  He said that J.B.D.’s level of distress was
“much less” than A.J.D.’s and that there was “some probability” of significant
impairment to J.B.D.’s emotional well-being in the absence of visitation with
Connie.  Dr. Otis acknowledged, however, that he could not isolate Connie from
the rest of her family and say that significant impairment to the children’s emotional
well-being would occur just because of a denial of visitation with Connie. 
Finally, Dr. Otis recommended in his 2008 report that “putting controls in
place, such as the [graduated visitation schedule he] recommended in the
initial evaluation would be helpful and important.” 

E. 
Trial Court Orders Grandparent Visitation

After
trial, the trial court signed a judgment ordering grandparent visitation with
Connie on the third Saturday of each month and denying Ricky’s request for
attorney’s fees.  Connie submitted 107 findings of fact and conclusions of law
that the trial court signed without revision or modification.[6] 
This appeal followed.

III. 
Connie Has Standing

          Ricky
contends in his second issue that Connie does not have standing to seek
grandparent access “because she failed to meet an express element of section
153.433 of the Texas Family Code.”  See Tex. Fam. Code Ann. § 153.433.  Specifically,
Ricky argues that the denial of possession or access is an express element of a
grandparent’s claim for possession or access under section 153.433 and that
there is no evidence that the children were cut off from Connie.

Although
we agree that the denial of possession of or access to the child is an express
element a grandparent must prove to obtain access pursuant to section 153.433, see
In re J.M.T., 280 S.W.3d 490, 493 (Tex. App.—Eastland 2009, no pet.), a
grandparent’s standing is not conferred by section 153.433.  Rather, a
grandparent’s standing to seek possession or access to a child is conferred by
section 153.432.  In re Smith, 260 S.W.3d 568, 572–73 (Tex. App.—Houston
[14th Dist.] 2008, orig. proceeding); see Tex. Fam. Code Ann. § 153.432
(West Supp. 2010).  “Although a successful access suit might require the
grandparent to satisfy section 153.433, whether the grandparent ultimately will
succeed is a different question than whether the grandparent has the right
simply to bring suit.”  Smith, 260 S.W.3d at 573.  Section 153.432(a)
provides that “a biological or adoptive grandparent may request possession of
or access to a grandchild by filing:  (1) an original suit; or (2) a suit for
modification as provided by [family code] chapter 156.”  Tex. Fam. Code Ann. §
153.432(a).  It is undisputed that Connie is the biological grandmother of the
children.  She therefore has standing pursuant to section 153.432 to seek
possession of or access to the children, and we overrule Ricky’s second issue. 
See id.; Smith, 260 S.W.3d at 572–73.

IV. 
Significant Impairment

          Ricky
contends in his first issue that the trial court violated the law of the case
because “virtually nothing has changed” since the supreme court granted his
petition for a writ of mandamus.  Specifically, Ricky argues that although Dr.
Otis modified his testimony by “attempting to use the magic buzz words,” Dr.
Otis’s underlying observations and conclusions “have not changed at all.” 

A.  Applicable Law

          1. 
Texas Family Code Section 153.433(a)

          “The
Legislature set a high threshold for a grandparent to overcome the presumption
that a fit parent acts in his children’s best interest:  the grandparent must
prove [by a preponderance of the evidence] that denial of access would ‘significantly
impair’ the children's physical health or emotional well-being.”  Derzapf,
219 S.W.3d at 334 (citing Tex. Fam. Code Ann. § 153.433(a)(2)).  This
high threshold exists so that a court will refrain from interfering with
child-rearing decisions made by a parent simply because the court believes that
a “better decision” could have been made. See id. at 334 (quoting Troxel
v. Granville, 530 U.S. 57, 73, 120 S. Ct. 2054, 2064 (2000)).  This
standard recognizes that “so long as a parent adequately cares for his or her
children (i.e., is fit), there will normally be no reason for the State to
inject itself into the private realm of the family.”  Id. at 333
(quoting In re Mays-Hooper, 189 S.W.3d 777, 778 (Tex. 2006) (orig.
proceeding)). 

          We
review a trial court’s decision to grant a grandparent’s request for access or
possession for an abuse of discretion.  In re Chambless, 257 S.W.3d 698,
699 (Tex. 2008); Derzapf, 219 S.W.3d at 333.  A trial court abuses its
discretion if it grants access to grandchildren when the grandparent has not
proven that denying the grandparent access to the child would significantly
impair the child’s physical health or emotional well-being.  In re Scheller,
325 S.W.3d 640, 643 (Tex. 2010) (orig. proceeding) (quoting Derzapf, 219
S.W.3d at 333).  This is so because “a trial court has no discretion in
determining what the law is or applying the law to the facts, even when the law
is unsettled.”  Derzapf, 219 S.W.3d at 333 (quoting In re Prudential
Ins. Co. of Am., 148 S.W.3d 124, 135 (Tex. 2004) (orig. proceeding)).

          2. 
Law of the Case

          “The
‘law of the case’ doctrine is defined as that principle under which questions
of law decided on appeal to a court of last resort will govern the case
throughout its subsequent stages.”  Loram Maint. of Way, Inc. v. Ianni,
210 S.W.3d 593, 596 (Tex. 2006) (quoting Hudson v. Wakefield, 711 S.W.2d
628, 630 (Tex. 1986)).  The doctrine may be applied when an issue has been
resolved on the merits in a prior mandamus proceeding.  See In re Cantu de
Villarreal, 330 S.W.3d 11, 20–21 (Tex. App.—Corpus Christi 2010, no pet.)
(holding law of the case doctrine prevented reconsideration of issue decided in
earlier mandamus petition); Landerman v. State Bar of Tex., 247 S.W.3d
426, 433 (Tex. App.—Dallas 2008, pet. denied) (stating “[r]eview of a trial
court’s action under the abuse of discretion standard is a question of law”); see
also In re A.T.M., No. 12-07-00243-CV, 2009 WL 1492832, at *3 (Tex.
App.—Tyler May 29, 2009, pet. denied) (mem. op.) (stating prior holding as to
whether abuse of discretion occurred was question of law, noting facts
previously presented were “substantially the same,” and holding prior mandamus
denial was law of the case).

“By
narrowing the issues in successive stages of the litigation, the law of the
case doctrine is intended to achieve uniformity of decision as well as judicial
economy and efficiency.  The doctrine is based on public policy and is aimed at
putting an end to litigation.”  Briscoe v. Goodmark Corp., 102 S.W.3d
714, 716 (Tex. 2003) (quoting Hudson, 711 S.W.2d at 630).  The doctrine applies
only to questions of law rather than questions of fact, and it “does not
necessarily apply when either the issues or the facts presented at successive
appeals are not substantially the same as those involved on the first trial.”  Hudson,
711 S.W.2d at 630.  Indeed, the decision to revisit a previous holding is left
to the discretion of the court under the particular circumstances of each case.
 City of Houston v. Jackson, 192 S.W.3d 764, 769 (Tex. 2006).  In other
words, a reviewing court may apply the law of the case doctrine in a subsequent
proceeding if the facts in the later proceeding are “so nearly the same [as the
earlier proceeding] that they do not materially affect the legal issues
involved in the later proceeding.”  Lawrence v. City of Wichita Falls,
122 S.W.3d 322, 326 (Tex. App.—Fort Worth 2003, pet. denied).

B. 
Discussion

          To
determine whether we should apply the law of the case doctrine, we must compare
the evidence from the 2005 temporary orders hearing (upon which the supreme
court granted Ricky’s petition for a writ of mandamus) and the evidence from
the 2009 trial on the merits.

          1. 
Dr. Otis’s 2005 Testimony

Dr.
Otis testified in 2005 that Ricky had legitimate reasons to be concerned about
Connie’s influence over the children and that he had appropriately cut off the
children’s contact with Connie.  Discussing the Johnsons’ allegations in their
2003 SAPCR suit, Dr. Otis testified that he did not believe the accusations to
be true and that Ricky was justifiably devastated, hurt, angry, and offended. 
Dr. Otis agreed that he had not seen any evidence that Ricky was an unfit
parent or had provided the children with an unsafe environment. 

Dr.
Otis described J.B.D., five years old at the time, as very outgoing, animated,
enjoyable, loving, and “just a delight.”  He said that she had never met a
stranger, loved being the center of attention, “connect[ed] extremely well,”
and was “very attached to her brothers and to her father.” 

Dr.
Otis testified that the children, particularly B.G.D. and A.J.D., were “clearly
distraught” about the loss of their relationship with the Johnsons and that A.J.D.
was “the one that potentially might have some difficulties down the line.”  He
said A.J.D. “had the most emotional reaction during the [joint] session with
the Johnsons in terms of being tearful and a little bit distraught.”  Dr. Otis
testified that A.J.D. and B.G.D. had a “lingering sadness” about the lack of
contact with the Johnsons, and he said that they talked about their
grandparents “with a lingering kind of sadness, a yearning.”  But Dr. Otis also
said that the sadness had “not manifested as depression or behavioral problems
or acting out,” and he agreed that “sadness and yearning doesn’t rise to a
level of significant emotional impairment.” 

          Dr.
Otis also testified that the Johnsons had a great deal to offer the children,
including a connection to their deceased mother and a sense of loving
stimulation, belonging, family, warmth, and security.  He testified that the
Johnsons “have had important attachments to the children,” that it “would not
be healthy to cut them off,” that it would be harmful to the children’s
long-term psychological development, and that the children would be
“emotionally damaged” if visitations with the Johnsons were not resumed.  Dr.
Otis recommended that the children first renew contact with Randy and their
uncles and that Connie be integrated into the visitation plan after counseling. 
Dr. Otis did not recommend renewed contact with Connie alone. 

          After
the temporary orders hearing, the trial court granted the Johnsons’ request for
visitation with the children.  

          2. 
The Supreme Court’s 2007 Opinion

The
supreme court granted Ricky’s petition for a writ of mandamus and held that the
trial court abused its discretion by ordering grandparent visitation.  See
Derzapf, 219 S.W.3d at 331.  The supreme court held that Connie was
required to “overcome the statutory presumption that denying the children
access to her in particular—not Connie and Randy jointly or the Johnson family
as a whole—would significantly impair the children’s physical health or
emotional well-being,” and the court noted that Dr. Otis’s testimony related to
a denial of access to both her and Randy or to the Johnson family as a whole and
“d[id] not support renewed contact with Connie alone.”  Id. at 333.  The
court also mentioned Dr. Otis’s observation of lingering sadness and stated that
“[w]hile it is true that Dr. Otis believed the children would benefit from
renewed contact with the Johnson family, he did not testify that denying Connie
access to her grandchildren would significantly impair the children’s physical
or emotional health.”  Id.  Thus, although Dr. Otis testified that the
children experienced lingering sadness and yearning due to the loss of contact
with the Johnsons, that the children would be emotionally damaged without
access, and that denying access to the Johnsons would be harmful to the
children’s long-term psychological development, the supreme court held that
Connie had not met her burden of proving that denying her access to the
children would significantly impair their physical health or emotional
well-being.  Id. at 334.  

3. 
Dr. Otis’s 2009 Testimony

          Subsequent
to the supreme court’s grant of mandamus relief in March 2007, Dr. Otis
conducted separate telephone interviews with Ricky and Connie, and he
interviewed the children once as a group and once separately.[7]
 Dr. Otis also interviewed the mother of one of B.G.D.’s friends, a friend of
the Johnson family, and one of Ricky’s friends.  

Dr.
Otis testified at trial that the children renewed their attachments to Connie
and the Johnsons during the court-ordered visitations and that the children
felt comfortable, accepted, and part of the family.  He further opined that the
current level of contact was not meeting A.J.D.’s and J.B.D.’s emotional needs.
 Dr. Otis testified that A.J.D. “yearns” for more contact with the Johnsons and
strongly wanted more contact.  A.J.D. told Dr. Otis that he felt mad, sad, and
hopeless about not being able to see the Johnsons, and Dr. Otis opined that A.J.D.
would feel “deep disappointment” if he could not see the Johnsons regularly and
that it was important for A.J.D. to have resumed visitation.  He said that A.J.D.’s
deep disappointment could “potentially manifest itself into potential
depression” and could “potentially manifest itself in anger at Ricky,” that A.J.D.
“grieves” not seeing the Johnsons, that being cut off from the Johnsons is an
aspect to the grief and loss of his mother, and that A.J.D.’s feelings of
hopelessness and despair “could” affect his well-being.  After further
questioning, Dr. Otis testified that there is a “high probability” that denying
A.J.D. visitation with Connie would significantly impair A.J.D.’s emotional
well-being.  However, Dr. Otis testified that A.J.D. did not want anything to
interfere with his living with Ricky, that A.J.D. was not affected by any
negativity Ricky feels toward Connie, and that there was “no question” that A.J.D.
was “very bonded with his father.” Dr. Otis concluded his 2008 report by
stating that if visitations are not resumed, “the children, particularly A.J.D.,
may benefit from psychotherapy to help them work through their feelings of
frustration and grief.” 

          Discussing
J.B.D., Dr. Otis said that she experienced the visitations with the Johnsons
very positively.  However, he testified that J.B.D.’s level of distress was
“much less” than A.J.D.’s and that there was “some probability” that denying J.B.D.
visitation with Connie would significantly impair her emotional well-being. 
Dr. Otis described J.B.D. as very social, extroverted, affectionate, and
forthcoming and said she “gets a great deal of social support just about
everywhere she turns.” 

          On
cross-examination, Dr. Otis agreed that the children had exhibited significant
improvement when they had no access to the Johnsons.  Dr. Otis also agreed
that, as of the time of his 2008 report and although they again had little
contact with the Johnsons, A.J.D. and J.B.D. liked their new schools, were
developing rewarding friendships, and were doing well academically.  In fact,
Dr. Otis admitted that A.J.D. and J.B.D. were in good medical health and
achieving “in spite of” their infrequent contact with B.G.D. and the Johnsons. 
Dr. Otis also acknowledged the possibility that Connie could impose onto A.J.D.
and J.B.D. the type of negative influence she had previously imposed onto B.G.D.,
and Dr. Otis testified that the possible negative influence from Connie should
be a matter of concern to Ricky. 

          Moreover,
Dr. Otis testified that A.J.D. did not list Connie as being within his “core
group” of relationships, instead listing only Ricky, B.G.D., and one of his uncles. 
J.B.D. listed Connie in her core group, but she also listed Ricky; each of her
aunts, uncles, cousins, grandparents; and Ricky’s friends Sherri and Steve
Booker.  In fact, Dr. Otis acknowledged that he could not isolate Connie from
the rest of her family and say that significant impairment to the children’s emotional
well-being would occur just because of a denial of visitation with Connie. 
Finally, Dr. Otis again recommended a graduated visitation schedule that
integrated Connie after initial visitation with Randy and the children’s
uncles. 

          4. 
The Law of This Case

          In
its 2007 opinion granting mandamus relief from the 2005 temporary visitation
order, the supreme court held that Connie is required to prove that denying
access to her alone, as opposed to her and the rest of her family, would
significantly impair the children’s emotional well-being.  Derzapf, 219
S.W.3d at 333.  The supreme court then stated with respect to Dr. Otis’s 2005
report and testimony at the temporary orders hearing:

While it is true that
Dr. Otis believed the children would benefit from renewed contact with the
Johnson family, he did not testify that denying Connie access to her
grandchildren would significantly impair the children’s physical or emotional
health.  Dr. Otis’s testimony pertained either to both Connie and Randy or
to the Johnson family as a whole, but his recommendations do not support
renewed contact with Connie alone.  To the contrary, Dr. Otis noted that
Ricky had a reasonable interest in preserving “the children’s hard-won feelings
of peace and security” regained after contact with Connie ceased.

 

Dr. Otis’s report
concluded that the children should first have renewed contact with Randy, then
with the Uncles and extended family, and only later with Connie.  Dr. Otis
testified that his recommendation “was based on the strength that [he]
perceived that the grandfather, Randy has.”  In fact, Dr. Otis testified that
he could not recommend visitation with Connie, absent supervision, as Connie’s
problems controlling her impulses could be “very influential” and detrimental
to the children.

 

And while Dr. Otis
testified that it may be harmful for Ricky to cut off the Johnsons’ access to
B.G.D. in particular and that it was in the children’s best interest that they
have some contact with their grandparents, his testimony does not support
awarding Connie access over Ricky’s objection.  According to Dr.
Otis, “[t]he manner in which she resisted the children transitioning to [Ricky’s]
full-time care interfered with the children’s emotional and behavioral
adjustment.”  He also concluded that Connie actively attempted to alienate
B.G.D. from his father and that her behavior was “very damaging” to the
parent-child relationship.  Moreover, while Dr. Otis noted the children’s
“sadness” at being unable to see their grandparents, he admitted that these
feelings did not rise to the level of a significant emotional impairment.

 

Id. at
333–34 (emphasis added).  The court then held that Connie had failed to meet
the “high threshold” required by section 153.433(a)(2) for obtaining access to
the children over Ricky’s objection.  Id. at 334.

          5. 
Dr. Otis’s Observations Did Not Change

          There
is no substantive difference between Dr. Otis’s 2005 and 2009 testimony.  Dr.
Otis did not state in his 2008 report that A.J.D. or J.B.D. might suffer
significant emotional impairment from a denial of visitation with Connie,
stating instead that A.J.D. and J.B.D. “are at risk to experience more
psychological harm if they are cut off from further involvement with Connie and
the Johnson family than if they have contact.”  And although Dr. Otis changed
his ultimate conclusion in 2009 (while testifying at trial in response to
questions by Connie’s lawyer) to a “high probability” of significant emotional
impairment for A.J.D. and “some probability” of significant emotional
impairment for J.B.D., the observations underlying his 2005 and 2009 opinions were
no different.  In both instances, Dr. Otis described the benefits the children
gained from access to the Johnsons and the lingering sadness, yearning, and
grief the children would experience in the absence of visitations.  The supreme
court has already held in this case that lingering sadness, yearning, and grief
from the lack of access coupled with the inability to segregate Connie from her
family and the benefits gained from access do not rise to the level of
significant emotional impairment required by section 153.433.  See Derzapf,
219 S.W.3d at 333–34; see also Scheller, 325 S.W.3d at 643–44 (holding
trial court abused its discretion by issuing temporary order for grandparent visitation
even though the grandchildren had displayed anger, had experienced isolated bed
wetting and nightmares, and had suffered the impact of losing their mother).

          6. 
Connie’s Arguments

          Connie
argues that the law of the case doctrine does not apply because the supreme
court addressed a question of fact, not a question of law, when it held that
the trial court abused its discretion by entering the temporary order.  We
disagree because “[r]eview of a trial court’s action under the abuse of
discretion standard is a question of law.”  Landerman, 247 S.W.3d at 433
(citing El Dorado Motors, Inc. v. Koch, 168 S.W.3d 360, 368 (Tex. App.—Dallas
2005, no pet.); see In re A.T.M., 2009 WL 1492832, at *3 (stating that
prior holding as to whether abuse of discretion occurred was a question of law).

          Connie
also argues that the issues now presented are not identical to those determined
by the supreme court because the supreme court addressed whether Randy had
standing and “whether the evidence presented at the temporary hearing in 200[5]
showing that the denial of access to both grandparents would
significantly impair the children’s emotional well-being was also sufficient to
show significant impairment as to Connie alone.”  Again, we disagree. 
The supreme court addressed the issue of whether the trial court abused its discretion
by awarding grandparent access, and it held that Randy did not have standing
and that Connie had not overcome the presumption that a fit parent acts in his
children’s best interest by proving that denial of access would significantly
impair the children’s physical health or emotional well-being.  Derzapf,
219 S.W.3d at 332–34.  The question presented in this appeal is likewise whether
the trial court abused its discretion by awarding visitation to Connie when she
allegedly failed to overcome the presumption that a fit parent acts in his
children’s best interest by proving that denial of access would significantly
impair the children’s emotional well-being.  Thus, we cannot agree that the
issue now presented differs to such an extent from that in the mandamus
proceeding to make the law of the case doctrine inapplicable.

          Finally,
Connie argues that the facts at trial are “dramatically different” than those
at the time of the temporary orders hearing.  She first points to Dr. Otis’s
trial testimony and opinions, but we have already discussed the striking similarities
in Dr. Otis’s testimony from the temporary orders hearing and the trial and
need not repeat them here.  Connie also points to Ricky’s alleged “extreme”
alienation of B.G.D.  But Ricky’s and Connie’s respective relationships with B.G.D.
are indisputably different than Ricky’s and Connie’s respective relationships
with A.J.D. and J.B.D., and they were indisputably different at the time of the
temporary orders hearing.  

First,
Dr. Otis testified that B.G.D.’s description of his strained and emotionally
distant relationship with Ricky was not entirely accurate because B.G.D. was
attempting to justify his decision to emancipate and move into Connie’s home. 
Moreover, Dr. Otis testified that B.G.D.’s and A.J.D.’s experiences are not
equivalent.  In fact, Dr. Otis was impressed by A.J.D.’s ability to think for
himself, to have his own point of view, and to not be affected by Ricky’s
negative feelings about Connie or B.G.D.’s negative feelings about Ricky; and
he offered a similar opinion of J.B.D.’s objective view of the conflict between
Ricky and the Johnsons.  More importantly, Dr. Otis testified that there was
more going on with B.G.D. than either Ricky or Connie understood.  Dr. Otis
described B.G.D.’s condition as the “sleeper effect” and explained that his
recent experience with girlfriends had activated his feelings of loss of his
mother in a way that B.G.D. did not understand and that caused an “almost
panicky desperate yearning for that kind of relatedness that he had with his
mother at one time and ha[d] lost.”  Dr. Otis testified that A.J.D.’s and J.B.D.’s
relationships with Ricky are “far different” than B.G.D.’s, saying that A.J.D.
and J.B.D. are “very securely attached to their dad.  They love him dearly. 
They don’t ever want that to be jeopardized.  They feel very secure living with
him in relation to him.  They don’t share the animosity or the oppositionality
or the resentment that [B.G.D.] experiences toward his dad.”  Finally, grandparent
visitation with B.G.D. is not at issue in this appeal.  Thus, B.G.D.’s
situation is not comparable to A.J.D.’s or J.B.D.’s, and we are not convinced
that B.G.D.’s changed relationship with Ricky sufficiently altered the factual
landscape of this case to make the law of the case doctrine inapplicable,
particularly when Dr. Otis used identical terms to describe A.J.D.’s and J.B.D.’s
emotional states both before and after B.G.D.’s relationship with Ricky
changed.  

7. 
The Trial Court Abused Its Discretion

          The
circumstances of this case are unfortunate, as are the circumstances in many
grandparent-access cases.  As Justice Kennedy wrote in his dissent in Troxel,


It must be
recognized, of course, that a domestic relations proceeding in and of itself
can constitute state intervention that is so disruptive of the parent-child
relationship that the constitutional right of a custodial parent to make
certain basic determinations for the child’s welfare becomes implicated . . . .
If a single parent who is struggling to raise a child is faced with visitation
demands from a third party, the attorney’s fees alone might destroy [the
parent’s] hopes and plans for the child’s future.  Our system must confront
more often the reality that litigation can itself be so disruptive that
constitutional protection may be required; and I do not discount the
possibility that in some instances the best interests of the child standard may
provide insufficient protection to the parent-child relationship.  We owe it to
the Nation’s domestic relations structure, however, to proceed with caution.

 

530
U.S. at 101, 120 S. Ct. at 2079 (Kennedy, J., dissenting).  While Justice
Kennedy was responding to whether something more than a best-interests standard
should govern third-party access suits, Justice Kennedy’s observations are
especially poignant, particularly in cases like this one.  

Ricky
is a single parent who, by all accounts, adequately feeds, clothes, and
shelters his children, and his fitness as a parent is demonstrated by A.J.D.’s
and J.B.D.’s significant emotional and social improvement in the years
following their mother’s death.  Of course, Connie and her family believe, with
support from Dr. Otis, that Ricky could outwardly exhibit more emotion when
interacting with his children, but courts must tread lightly when interfering
with a fit parent’s decision to limit his children’s access to their extended
family.  As Justice O’Connor wrote for the plurality in Troxel, “In an
ideal world, parents might always seek to cultivate the bonds between
grandparents and their grandchildren.  Needless to say, however, our world is
far from perfect, and in it the decision whether such an intergenerational
relationship would be beneficial in any specific case is for the parent to make
in the first instance.”  Id. at 70, 120 S. Ct. at 2062.  

Because
our state supreme court previously held that the trial court abused its
discretion by ordering grandparent visitation to Connie based on testimony by
Dr. Otis that does not substantively differ from Dr. Otis’s trial testimony, we
hold that the trial court abused its discretion by granting, over Ricky’s
objection, Connie’s petition for grandparent visitation.  See Scheller,
325 S.W.3d at 643–44; Derzapf, 219 S.W.3d at 334.  We therefore sustain
Ricky’s first issue.[8]

IV. 
Attorney’s Fees

          In
his seventh issue, Ricky asks that we remand the case to the trial court for further
consideration of his request for attorney’s fees.  “The award of attorney's
fees in a suit affecting the parent-child relationship is within the trial
court’s discretion.”  Bruni v. Bruni, 924 S.W.2d 366, 368 (Tex. 1996); see
Tex. Fam. Code Ann. § 106.002(a) (West 2008).  Given our disposition of Ricky’s
first issue, Ricky is now the prevailing party in this litigation.  Although
Ricky’s status as the prevailing party is only one consideration in the trial
court’s exercise of discretion when deciding whether to award him attorney’s
fees, remand for reconsideration of the recoverability of Ricky’s fees is
appropriate.  We therefore sustain Ricky’s seventh issue and remand this case
to the trial court so that the trial court may reconsider whether Ricky should
recover attorney’s fees from Connie.  See Bruni, 924 S.W.2d at 368–69
(remanding case to permit trial court to reconsider attorney’s fee award in
light of decision on appeal).

V. 
Conclusion

          Having
overruled Ricky’s second issue; having sustained his first and seventh issues;
and having not reached his third, fourth, fifth, or sixth issues, we reverse
the trial court’s judgment and remand this case to the trial court for further proceedings
consistent with this opinion.

 

 

ANNE GARDNER
JUSTICE

 

PANEL: 
GARDNER,
WALKER, and MCCOY, JJ.

 

DELIVERED:  August 25, 2011









[1]Although Connie originally
sought court-ordered grandparent visitation with B.G.D. when she filed this
suit in 2004, visitation with B.G.D. is no longer at issue because B.G.D.
became legally emancipated the week before trial.





[2]Ricky’s attorney also
testified concerning Ricky’s attorney’s fees.





[3]Dr. Connell testified at
the 2005 temporary orders hearing that parental alienation is intractable and
“a very difficult phenomenon to treat.” 





[4]Dr. Otis testified that
B.G.D.’s description of his relationship with Ricky was not entirely accurate;
B.G.D.’s relationship with Connie predated Ricky’s, and B.G.D. had a different
relationship with Ricky than J.B.D. and A.J.D. and was depressed before he
moved.  However, Dr. Otis believed that B.G.D.’s trial testimony was an attempt
to justify his decisions to seek emancipation and move into Connie’s home.





[5]Connie denied encouraging
or bribing B.G.D. to move into her home and testified that she advised him to
think seriously about doing so, but she also told B.G.D. that she would not
turn him away if he decided to move in with her.





[6]We have reviewed each of
the trial court’s findings of fact and note that many are not supported by any
evidence in the record.  See generally McGalliard v. Kuhlmann,
722 S.W.2d 694, 696 (Tex. 1986) (stating that unchallenged findings of fact
“are binding on an appellate court unless the contrary is established as a
matter of law, or if there is no evidence to support the finding”); Rischon
Dev. Corp. v. City of Keller, 242 S.W.3d 161, 166 (Tex. App.CFort Worth 2007, pet.
denied), cert. denied, 129 S. Ct. 501 (2008) (same). 





[7]Dr. Otis did not serve as
the children’s counselor in any capacity, and he did not see or talk to them in
the nearly three years since preparing his initial report.





[8]Given our disposition of
Ricky’s first issue, we do not reach his third through sixth issues.  See
Tex. R. App. P. 47.1 (requiring appellate court to address “every issue raised
and necessary to final disposition of the appeal”).